# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 0542 | **DATE** | 4/11/2003 |
| **CASE TITLE** | Miguel Yepez vs. Courtesy Manufacturing Company | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

Defendant's Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56

**DOCKET ENTRY:**

| (1) | ☐ | Filed motion of [ use listing in "Motion" box above.] |
|---|---|---|
| (2) | ☐ | Brief in support of motion due _____. |
| (3) | ☐ | Answer brief to motion due_____. Reply to answer brief due_____. |
| (4) | ☐ | Ruling/Hearing on _____ set for _____ at _____. |
| (5) | ☐ | Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (6) | ☐ | Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____. |
| (7) | ☐ | Trial[set for/re-set for] on _____ at _____. |
| (8) | ☐ | [Bench/Jury trial] [Hearing] held/continued to _____ at _____. |
| (9) | ☐ | This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2). |
| (10) | ■ | [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, Courtesy Manufacturing Company's motion for summary judgment is GRANTED [13-1]. All other motions are moot and terminated. This action is closed. |
| (11) | ■ | [For further detail see order attached to the original minute order.] |

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | APR 14 2003 | |
| X | Notified counsel by telephone. | | date docketed | |
| X | Docketing to mail notices. | | | 22 |
| X | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | U.S. DISTRICT COURT | | |
| klb (lc) | courtroom deputy's initials | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MIGUEL YEPEZ, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 02 C 0542 |
| v. ) | |
| ) | HONORABLE DAVID H. COAR |
| COURTESY MANUFACTURING ) | |
| COMPANY, ) | |
| ) | |
| Defendant. ) | |

DOCKETED
APR 1 4 2003

## MEMORANDUM OPINION AND ORDER

Plaintiff, Miguel Yepez ("Yepez" or "plaintiff"), filed this action against defendant, Courtesy Manufacturing Company ("Courtesy" or "defendant"), alleging that Courtesy discriminated against him on the basis of his national origin/ancestry in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000 et seq., and the Civil Rights Act of 1991, 42 U.S.C. § 1981. Before this court is Courtesy's motion for summary judgment. For the reasons set forth below, Courtesy's motion is granted.

I.  FACTUAL BACKGROUND

Courtesy is an Illinois corporation, and it is engaged in the business of engineering, prototype development, short-run fabrication, high-volume stamping, welding and assembly of small and large metal chassis, frames and enclosures. Between October 11, 1999 and August 18, 2000, Courtesy employed Yepez as an in-process inspector in its Quality Control Department. The job description for an in-process inspector was to "check and examine product from each production run to verify that product meets all significant visual and measurement parameters,

-1-

including tolerances" and to perform "[o]ther duties that may be assigned." Yepez, however, was never given a copy of the written job description.

Sterling Foster ("Foster") was employed as a quality control manager in Courtesy's Quality Control Department. Foster was Yepez's direct supervisor. Foster reported to John Piotrowski ("Piotrowski"), who was Courtesy's vice president of operations from December 1999 through September 2000. Piotrowski never made a negative comment about Yepez's ancestry or national origin, and never discriminated against him on the basis of his ancestry or national origin. Piotrowski reported to Thomas White ("White"), Courtesy's president and general manager. White never made a negative comment about Yepez's ancestry or national origin, and never discriminated against him on the basis of his ancestry or national origin. In August 200, Joyce Barber ("Barber") was Courtesy's human resources manager. Barber never made a negative comment about Yepez's ancestry or national origin, and never discriminated against him on the basis of his ancestry or national origin. John Mateo ("Mateo") was a shipping supervisor when Yepez was employed by Courtesy. Mateo never made a negative comment about Yepez's ancestry or national origin, and never discriminated against him on the basis of his ancestry or national origin. Edward Dahl ("Dahl") was a night shift supervisor when Yepez was employed by Courtesy. Dahl never made a negative comment about Yepez's ancestry or national origin, and never discriminated against him on the basis of his ancestry or national origin. Mike Ward ("Ward") was the plant manager while Yepez was employed by Courtesy. Ward reported to Piotrowski. Ward never made a negative comment about Yepez's ancestry or national origin, and never discriminated against him on the basis of his ancestry or national origin. Foster is the only person at Courtesy about whom Yepez complains.

Courtesy's Employee Handbook contains a procedure by which employees could report claims of harassment and discrimination. It provides, in part:

> Any alleged incident of harassment may be reported directly to your supervisor or to the Human Resources Dept. Substantiated claims of harassment will result in appropriate disciplinary action up to and including termination of employment. In addition, racial or ethnic slurs, threats of violence, and any other provocative comments, language, or any actions in provocative conduct [sic] towards co-workers or other individuals violates the standard of appropriate behavior in the workplace. Further, any employee displaying behavior such as obscenities, . . . will be considered insubordinate. In severe instances, the employee may be terminated.

Courtesy's Employee Handbook also contained proscriptions against insubordination and workplace violence, and a disciplinary policy:

> INSUBORDINATION
> Courtesy . . . will not, . . . tolerate employees who . . . refuse to submit to reasonable authority thus undermining a supervisor's ability to effectively supervise. Disciplinary measures can and will be taken immediately.
>
> * * *
>
> WORKPLACE VIOLENCE
> Courtesy Manufacturing Company must maintain a healthy and safe work environment . . . Courtesy . . . will not tolerate any workplace violence. If a situation [sic] takes place, . . . disciplinary action will take place.
>
> * * *
>
> DISCIPLINARY POLICY
> All Courtesy Mfg. rules and policies shall be enforced by a system of warnings ranging from verbal to termination. This will include poor performance reviews, insubordination . . . Except where otherwise specified, the four step disciplinary policy is as follows: [verbal warning, written warning, written warning with suspension, termination],
> Note: The employer reserves the right to make an exception to the above policy should the situation warrant such a decision.

Yepez does not recall seeing or acknowledging receipt of the Employee Handbook. Yepez acknowledged, however, that "[t]here must be a handbook as you showed me that many other companies must have that [sic] handbooks for all employees."

Jose Ramirez ("Ramirez") was a final assembler at Courtesy while Yepez was employed by Courtesy, and he did not have the same job duties as Yepez. While Yepez was employed by Courtesy, an employee known to Yepez only as Dave ("Dave") was a laid out inspector. According to Yepez, the job duties of an in-process inspector and a laid out inspector were different. While Yepez was employed by Courtesy, Yepez believed that a Black employee named Glen Williams ("Williams") was an "in-process auditor." Yepez never saw a job description for the position of "in-process auditor" while he was employed by Courtesy and he does not know how many "in-process auditors" were supposedly employed by Courtesy.

In July 2000, Foster repeatedly told Yepez that he was working too slowly and that he needed to work harder. On one occasion, when Foster told Yepez he had to work harder, Yepez told Foster not to expect him to work as hard as Ramirez because Ramirez, who worked in a different position, had people to assist him and Yepez did not.

In or about June or July 2000, Piotrowski observed Yepez removing plastic covering from stainless steel doors manufactured by Courtesy. What happened next is the subject of much contention. Piotrowski testified that he asked Yepez to stop ripping the plastic off of the stainless steel doors because a customer had complained to Courtesy that removing the plastic covering hurt the customer's production process. Piotrowski also testified that Yepez said that Piotrowski was not his boss and repeatedly told Piotrowski that he did not have to listen to him.

Further, Piotrowski testified that Yepez raised his voice and a plant manager intervened to take care of things. Yepez denies that he was ever insubordinate towards Piotrowski.

On August 17, 2000, there was an altercation between Foster and Yepez. In an August 17, 2000 memorandum reporting the altercation to Piotrowski, Foster summarized Yepez's misconduct as follows:

1. At approximately 4:30 PM, I was prompted to inspect doors and product to be shipped . .
2. After inspecting doors alone for . . . 20 minutes, I paged Mike Yepez to assist. Slowly he made his way [to the Shipping Area], and I requested of Mike to go and get two drawings so that I could check the parts to ensure that the parts were correct. Mike left to get the drawings. [Twenty] minutes later, I was still waiting for the drawings.
3. I ran into Mike in the Brake Press Area talking to a Turret Operator. He said he was helping the Turret Operator. I got the drawings myself.
4. I went back to inspecting parts and Mike never showed up to assist. I paged Mike about 10 minutes later, and slowly he strolled to the Shipping Department.
5. I discussed my displeasure with Mike. Initially I told him verbatim that he was very close to being terminated if he did not change his attitude and work behavior. I told him that I could send him home if his performance did not improve. This lecture was effective, I thought, because Mike began to inspect parts.
6. Several minutes later, Mike began to verbally abuse and threaten me. He told me that [h]e was going to get me and after he made a few phone calls that I would be in trouble. John Mateo overheard the entire conversation. I was really shocked by his comments and initially I did not respond. John was also amazed by the comments being made by Mike.
7. I asked Mike Yepez to clock out and go home at about 5:45 PM. At approximately 6:30 PM he left the building. The he came back to speak more with Ed [Dahl] . . .

In his August 17, 2000 memorandum to Piotrowski, Foster also stated that he had "experienced trouble" with Yepez in the past, and that Yepez did not possess the analytical ability to be an in-process inspector, that Yepez had trouble working alone, and that Yepez spent too much time

-5-

talking with co-workers and drinking coffee instead of working.[1] In his memorandum, Foster also noted that Ward had recently sought approval for an in-process inspector to work on the night shift, and Foster voiced his opinion that if Yepez had been performing his duties adequately, Ward would have not made that request.[2] Finally, Foster "highly recommend[ed] that Yepez be transferred to [Courtesy's] Punch Press Department of Brake Press Area where continuous supervision is provided."

Yepez acknowledges that Foster had the authority to send him home from work and admits that he did not clock out when he was instructed to do so by Foster. Yepez acknowledges that Mateo was present for part of the altercation between Yepez and Foster on August 17, 2000. On August 17, 2000, Dahl told Yepez that he was going to mention that day's altercation between Yepez and Foster to Piotrowski. On August 18, 2000, Dahl sent Ward a memorandum in which he advised Ward that "We had harsh words exchanged between Sterling Foster and Mike Yepez . . . I explained to Mike the appropriate behavior I expect on my shift I am sure [sic] you will hear about this today from Sterling."[3]

On August 18, 2000, during a meeting attended by Piotrowski, Barber, Mateo, Yepez, and Foster, the events of August 17, 2000 were discussed and Yepez was terminated. Piotrowski recommended to Foster that Yepez be discharged because he believed the remarks Yepez made

---

[1] Yepez admits that this is an accurate summary of Foster's report. He denies that Foster has accurately described the incident.

[2] Yepez admits that this is an accurate summary of Foster's report, but denies that he was not performing his job adequately.

[3] Yepez admits that this is an accurate summary of Dahl's memo but denies that it is an accurate accounting of Yepez's discussion with Foster on August 17, 2000.

to Foster on August 17, 2000 were threats and that Yepez had been insubordinate. Foster was not free to disregard Piotrowski's recommendations. The "Payroll Authorization/Payroll Change Notice" form used to record Yepez's termination indicates that Yepez was fired for insubordination, disruptive behavior, and "Abusive remarks, refuse [sic] to assist inspecting parts last nights [sic]. General bad attitude." During the August 18, 2000 meeting, Barber invited Yepez to submit to her any information he desired regarding his alleged mistreatment by Foster and the incident of August 17, 2000. Yepez never reported to Barber, White, or anyone else at Courtesy that he believed he was being discriminated against on the basis of his ancestry and/or national origin.

On August 21, 2000, Mateo prepared a memorandum for Barber in which he set forth his recollection of the August 17, 2000 altercation between Yepez and Foster. In that memorandum, Mateo stated in pertinent part that:

> The incident with Sterling Foster and Mike Yepez went as follows:
> 1. The date August 17th. The time was approximately 5:00 PM
> 2. Sterling was ... inspecting parts ... Sterling had went to Mike for assistance, but Mike was still up front.
> 3. Sterling mentioned that Mike would be the person performing the Dock Audits on The Second Shift. When Mike heard his name mentioned he erupted with words of anger. He told Sterling that he was not going to be performing any inspections. Mike then stated that "we will talk about this tomorrow." Sterling did not respond.
> 4. Mike kept talking. He was talking himself [sic] loud enough for every one [sic] to hear. He stated that "he was going to make some phone calls tonight and take care of this." Sterling did not respond until Mike kept repeating that he was going to do something. What exactly Mike intended to do was unknown.
> 5. Sterling kept his cool until Mike said again that he was going to make some calls. Then Sterling went over to Mike and told him to Clock Out and go home ...
> These are the events that I remember. I swear that these are the facts.

Following his termination, Yepez submitted four memoranda to Courtesy concerning his dealings with Piotrowski, Foster, and other employees of Courtesy, as well as his version of the altercation on August 17, 2000. None of these memoranda makes any mention of his allegedly being discriminated against because of his ancestry and/or national origin. On August 30, 2000, Piotrowski prepared a response to one of Yepez's memoranda, and in it he stated that "I have personal [sic] experienced the type of behavior outlined in John Mateo's memo within [sic] Mike Yepez on another occasion."[4]

On or about December 18, 2000, Yepez filed a charge of discrimination with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC") in which he claimed he had been subjected to unequal terms and conditions of employment, and discharged from his position at Courtesy, because of his "national origin/ancestry, Mexico/Hispanic." On or about June 11, 2001 Yepez filed an amended charge of discrimination with the IDHR and the EEOC, in which he claimed that Courtesy also had discriminated against him on the basis of a perceived and/or actual disability. Yepez claims that he mentioned retaliation to the IDHR when he filed his original and amended charges of discrimination, but retaliation is not checked on, or mentioned in, either of the charges. On or about August 20, 2001, Yepez withdrew the charge of discrimination he had filed with the IDHR. On or about October 29, 2001, the EEOC dismissed the charge of discrimination pending before it and issued Yepez a notice of right to sue.

---

[4]Yepez admits that the statement is an accurate quote from Piotrowski's memo, but denies that Piotrowski personally experienced the type of behavior described in the memo.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of triable fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir.2001) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "In the employment discrimination context, summary judgment is warranted where 'the evidence, interpreted favorably to the plaintiff, could [not] persuade a reasonable jury that the employer had discriminated against the plaintiff.' " Markel v. Bd. of Regents of the Univ. of Wis. Sys., 276 F.3d 906, 910 (7th Cir.2002) (quoting Palucki v. Sears, Roebuck & Co., 879 F.2d 1568, 1570 (7th Cir.1989)).

The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The party that bears the burden of proof on a particular issue, however, may not rest on its pleadings but must affirmatively demonstrate that there is a genuine issue of material fact. Id. at 324, 106 S.Ct. at 2553. A mere scintilla of evidence in support of the non-movant's position is insufficient. See Anderson, 477 U.S. at 252, 106 S.Ct. at 2512. A party will be successful in opposing summary judgment only if it presents "definite, competent evidence to rebut the motion." EEOC v. Roebuck & Co., 233 F.3d 432, 437 (7th Cir.2000). The Court "considers the evidentiary record in the light most favorable to the non-moving party, and draws all reasonable inferences in his favor." Lesch v. Crown Cork & Seal Co., 282 F.3d

467, 471 (7th Cir.2002). The Court accepts the non-moving party's version of any disputed facts but only if it is supported by relevant, admissible evidence. Bombard v. Fort Wayne Newspapers, Inc., 92 F.3d 560, 562 (7th Cir.1996). A plaintiff's self-serving statements, unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir.2001); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir.1993).

III. DISCUSSION

Yepez claims that Courtesy violated Title VII by subjecting him to unequal terms and conditions of employment and discharging him because of his national origin/ancestry, which is Mexican/Hispanic. In support of his claim, Yepez claims that Foster (1) provided training for the position of "in-process auditor" to similarly-situated non-Mexican/non-Hispanic employees, and refused to provide that training to him, (2) hired employees to work as in-process auditors, instead of training him to work in that position, (3) made him work harder and faster than his non-Mexican/non-Hispanic coworkers, and (4) suspended him and later discharged him, but did not discharge a non-Mexican/non-Hispanic employee who allegedly threatened Foster. Courtesy has moved for summary judgment on all of Yepez's claims.

A claim of discrimination may be established in one of two ways-- under the direct method or the indirect burden-shifting method set forth in McDonnell Douglas v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Haywood v. Lucent Technologies, _ F.3d _, 2003 WL 1400496 (7th Cir. 2003). Under the direct method, the plaintiff may show either through direct or circumstantial evidence that the employer's decision to take the adverse job

action was motivated by an impermissible purpose, such as his national origin. See id.; Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir.1994).

Under the McDonnell Douglas paradigm, plaintiff has the burden of establishing a prima facie case of national origin discrimination. To do so, he has to show that: (1) he was a member of a protected class; (2) he was meeting his employer's legitimate job expectations; (3) he suffered an adverse employment action; and (4) similarly situated employees not in the protected class were treated more favorably. McDonnell Douglas, 411 U.S. at 802; Wells v. Unisource Worldwide, Inc., 289 F.3d 1001, 1006 (7th Cir.2002). Once a prima facie case has been established, the employer bears the burden of offering a legitimate, nondiscriminatory purpose for its action; which plaintiff must then rebuff as pretextual. Id.

It is undisputed that plaintiff is a member of a protected class. To determine whether Yepez has met the second element of his prima facie case of disparate treatment, the Court must determine whether he has presented sufficient evidence showing that he was meeting Courtesy's legitimate job expectations. An employee alleging discrimination must demonstrate that he or she was meeting the expectations of the employer either before or up until their termination. See Lim v. Tr. of Ind. Univ., 297 F.3d 575, 581 (C.A.7th Cir.2002). "Although general averments of adequate performance are insufficient to create a factual issue on summary judgment even when corroborated by statements of supervisors or coworkers, a plaintiff may create an issue of fact by specifically refuting facts that allegedly support the employer's claim of performance deficiencies." Dey v. Colt Constr. & Dev. Co., 28 F.3d 1446, 1460 (7th Cir.1994).

To determine whether Yepez has met the third element of his prima facie case of disparate treatment, the Court must determine whether he has presented sufficient evidence

showing that Courtesy's actions were adverse employment actions. An adverse employment action is one that materially affects the terms and conditions of employment. See Rabinovitz v. Pena, 89 F.3d 482, 488 (7th Cir.1996). A plaintiff can establish an adverse action with evidence of termination, demotion, decrease in salary or benefits, or significantly diminished responsibilities. See id. (citing Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir.1993)). The overriding emphasis is that the action must have a materially adverse effect on the conditions of employment. See Haugerud v. Amery School Dist., 259 F.3d 678, 690-91 (7th Cir.2001) (emphasis added). Determining what is materially adverse depends on the facts of each case, and adverse actions can be both blatant and subtle. Id. at 690 (noting that adverse employment actions consist of quantitative and/or qualitative changes in the terms and conditions of employment). Nonetheless, " 'not everything that makes an employee unhappy is an actionable adverse action.' " Id. (quoting Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir.1996)). There must be some type of material change in the terms and conditions of employment. Id.

To determine whether Yepez has met the fourth element of his prima facie case of disparate treatment, the Court must determine whether he has presented sufficient evidence showing that Courtesy treated persons outside of the protected class more favorably than he. Where a plaintiff claims he was treated more harshly than other similarly situated employees based on a prohibited reason, the "plaintiff must show he is similarly situated with respect to performance, qualifications and conduct." Snipes v. Illinois Dep't of Corrs., 291 F.3d 460, 463 (7th Cir.2002). "Such a showing normally entails establishing that 'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the

-12-

employer's treatment of them.' " Id. (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir.2000)). This showing is required because different employment decisions, when made by different supervisors, can account for any disparity in treatment, particularly when the decision relates to different employees. Id.

With respect to each claim, if the Court determines that Yepez has established a prima facie case, the Court will then analyze whether Courtesy has offered a legitimate, non-discriminatory reason for its actions. See Sirvidas v. Commonwealth Edison, 60 F.3d 375, 377-78 (7th Cir. 1995). If Courtesy has offered a legitimate, non- discriminatory reason for its actions, the Court will continue with the McDonnell Douglas burden shifting analysis to determine whether Yepez has offered sufficient proof showing that Courtesy's proffered reasons are a pretext for the alleged discrimination. See Sirvidas, 60 F.3d at 378.

A.  Failure to Train/ Hired and Trained Other People (Claims 1 and 2)

Plaintiff first asserts that Foster refused to provide "in-process auditor" training to him and instead hired and trained other people for that position. The defendants claim, however, that there was no position at Courtesy called "in-process auditor." Instead, employees were trained as ISO 9000 internal auditors and periodically examined Courtesy's manufacturing processes to ensure that they are in conformity with the ISO 9000 international quality standard. Courtesy further claims that those employees do not receive any extra or additional compensation for performing ISO 9000 internal audits. In addition, Courtesy submitted evidence that Yepez received the ISO 9000 training. Thus, according to the defendant, Yepez did not suffer an adverse employment action. Plaintiff, however, denies that he ever received such training.

Even assuming, arguendo, that the position of "in-process auditor" existed, Courtesy did not train Yepez, and that Courtesy's failure to train Yepez for such position could constitute an adverse employment action, Yepez's claim still fails. Yepez is unable to prove that he was meeting his employer's legitimate expectations. Yepez's own testimony concedes that Foster told him several times that he needed to work faster. In Yepez's declaration, he states that his former supervisors Larry Lynn and Peter Melville told him that he was doing a good job. (Declaration of Miguel Yepez, ¶ 6 "Yepez Decl."). Yepez also states that Foster's criticism was "not well-founded because I was performing my job accurately and as quickly as it was possible to perform the job correctly." (Yepez Decl., ¶ 16 ). Yepez's self serving statements, however, are not enough, standing alone, to create a genuine issue of material fact about whether he was meeting his employer's legitimate expectations. See Gustovich v. AT & T Communications, Inc., 972 F.2d 845, 848 (7th Cir.1992) (An employee's self-serving statements about his ability ... are insufficient to contradict an employer's negative assessment of that ability."); Dale v. Chicago Tribune Co., 797 F.2d 458, 464-65 (7th Cir. 1986) (an employee's perception of himself is not relevant; it is the perception of the decision maker which is relevant). Finally, Yepez is unable to show that a similarly situated employee, not in Yepez's protected class, was treated more favorably. Yepez alleges that Glen Williams ("Williams"), a non-Hispanic, was hired by Foster for the position of in-process auditor and received training for said position. Yepez has not offered any evidence to show that Williams was similarly situated to him. Williams' qualifications and experience are unknown. In the absence of evidence showing that Williams, or any other employee, is similarly situated to Yepez, Yepez is unable to make out his prima facie case of discrimination.

B.  Yepez forced to work harder than Non-Hispanic/Non-Mexican employees (Claim 3)

Plaintiff next asserts that he was required to work harder than other employees. Yepez claims that he was given extra work assignments including sorting materials stored in the scrap area, and sorting skids of defective doors and other defective materials. Yepez alleges that these extra work assignments involved work that was "well beyond" his normal duties and "bore no relationship to the assigned duties of in-process inspector." (Yepez Decl., ¶ 12). Courtesy claims that these tasks were also assigned to Yepez's coworkers. Yepez argues that this disagreement creates a genuine issue of material fact which precludes summary judgment. Just as in Claims 1 and 2, however, Yepez is unable to show that he was meeting his employer's legitimate job expectations. Accordingly, Yepez has failed to make out a prima facie case.

C.  Yepez's termination (Claim 4)

According to Yepez, Foster said to him once or twice in June or July 2000 that "Mexicans are too slow – Mexicans are hard workers but you're too slow," and "Puerto Ricans are smarter than Mexicans." Foster denies making these statements. Even if Foster made the statements, they do not constitute direct evidence of discrimination. "A decisionmaker's use of racially charged language ... does not alone constitute direct evidence of discrimination. 'To rise to the level of direct evidence of discrimination ... isolated comments must be contemporaneous with the [adverse action] or causally related to the [applicable] decision-making process."' Adams v. Triton Coll., 35 Fed. Appx. 256, 259 (7th Cir.2002) (omitting citations). While admittedly, the alleged statements took place one to two months prior to Yepez's termination, Foster was not the ultimate decision maker. Nothing in the record demonstrates that Piotrowski

knew of Foster's alleged comments, or that there is a causal relationship between Foster's alleged comments and Piotrowski's decision to end Yepez's employment. Thus, Yepez's termination claim, like his other claims, must be evaluated under the McDonnell Douglas burden shifting method.

It is clear that termination is an adverse employment action. In this claim, however, the determination of whether Yepez was meeting the legitimate expectations of his employer is tied in with the pretext analysis. Accordingly, this Court will consider them together. Courtesy claims that Piotrowski terminated Yepez's employment because he believed that Yepez had been insubordinate to and threatened Foster, because Yepez had been insubordinate to him, and because he did not believe Yepez's explanation regarding the events of August 17, 2000. Piotrowski formed those beliefs based on personal experience with Yepez and the reports he received from Mateo and Foster. Thus, Courtesy has offered a legitimate non-discriminatory reason for Yepez's termination; insubordination. See Flores v. Preferred Technical Group, 182 F.3d 512, 515 (7th Cir. 1999) ("Insubordination is a legitimate, non- discriminatory reason for firing an employee."); Plair v. E.J. Brach & Sons, 105 F.3d 343, 345 (7th Cir. 1997) (same).

Yepez denies that he was insubordinate to Piotrowski, and that he was insubordinate to and threatened Foster. Yepez's denials miss the point. The question is not whether Yepez was actually insubordinate and threatened Foster, the question is whether Piotrowski honestly believed that Yepez was insubordinate. Yepez cannot show pretext by merely denying the conduct that forms the basis for his termination. Pretext means "a lie, specifically a phony reason for some action." Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir.1995). Yepez may establish pretext directly with evidence that Courtesy was more likely than not motivated by a

discriminatory reason, or indirectly by evidence that Courtesy's explanation is not credible. See Sarsha v. Sears, Roebuck & Co., 3 F.3d 1035, 1039 (7th Cir.1993). Under the indirect method, Yepez must show that Courtesy's proffered reasons are factually baseless, were not the actual motivation for the action, or were insufficient to motivate the action. He must also provide an inference that the real reason was discriminatory. See Jackson v. E.J. Brach Corp., 176 F.3d 971, 983 (7th Cir.1999). Yepez has not produced any such evidence. In fact, Yepez admits that he does not believe that Piotrowski bore him any animosity because of his national origin/ancestry. Absent evidence that Piotrowski fabricated his reasons for terminating Yepez, Yepez's discrimination claim fails.

Yepez's claim also fails because he can not show that he was treated less favorably than any of the individuals he claims were similarly situated to him. Yepez alleges that Mike Hess ("Hess") was treated better than Yepez because he was not fired even though he also allegedly threatened Foster. Foster testified that Hess never threatened him. Assuming, arguendo, that Hess threatened Foster, there are still differences between Hess and Yepez that negate Yepez's claim that they are similarly situated. There is no evidence that Hess ever refused to follow Foster's instructions, that Hess was insubordinate to Piotrowski, or that Hess was not performing adequately. In light of these differences between Hess and Yepez's conduct and performance, they cannot be said to be similarly situated. See Radue v. Kimberly-Clark Corporation, 219 F.3d 612, 617-18 (7th Cir. 2000) (explaining that in disciplinary cases a plaintiff must show that he is similarly situated with respect to performance, qualifications, and conduct). In addition, there is no record evidence that Piotrowski knew that Hess supposedly threatened Foster. That circumstance also prevents Yepez from establishing that he and Hess were similarly situated.

See Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1366 (7th Cir.1988) (holding that party responsible for termination must also know about similarly situated employees to sustain liability). Accordingly, Yepez is unable to make out a prima facie case of national origin discrimination.

## Conclusion

For the foregoing reasons, Courtesy Manufacturing Company's motion for summary judgment is GRANTED.

Enter:

_____
David H. Coar
United States District Judge

Dated: August 11, 2002